# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
May 18, 2010 Session

## STATE OF TENNESSEE v. LARRY SCOTT REYNOLDS

**Direct Appeal from the Circuit Court for Rutherford County**
**No. F-61326      Don R. Ash, Judge**

---

**No. M2009-00185-CCA-R3-CD - Filed December 16, 2010**

---

A Rutherford County jury convicted the Defendant, Larry Scott Reynolds, of first degree premeditated murder, and the trial court sentenced him to life in prison. On appeal, the Defendant contends that: (1) the evidence is insufficient to support his conviction; (2) the trial court improperly excluded evidence from Karla Teutsch, whom he alleges was a legitimate suspect in this murder investigation; (3) the trial court improperly admitted a statement by the victim as an excited utterance; (4) a question by a juror pursuant to Tennessee Rule of Criminal Procedure 24.1 violated his right to an impartial jury and that such questioning is unconstitutional; (5) the trial court erred when it failed to provide the jury with a curative instruction about people crying in the courtroom during the trial. After a thorough review of the record and applicable authorities, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, delivered the opinion of the Court, in which DAVID H. WELLES and JERRY L. SMITH, JJ., joined.

Joe Mason Brandon, Jr., Smyrna, Tennessee and R. Timothy Hogan, Murfreesboro, Tennessee, for the Appellant, Larry Scott Reynolds.

Robert E. Cooper, Jr., Attorney General and Reporter; Deshea Dulany Faughn, Assistant Attorney General; William Whitesell, District Attorney General, J. Paul Newman, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from the killing of Melissa Atkin, the victim, on or about December 16, 2007, for which the Defendant was indicted on a charge of first degree premeditated murder. At his trial, the following evidence was presented: The victim's mother and father, Linda and Doug Atkin, testified the victim was thirty-six at the time of her death and had only one child, a son named Lucas, whose father was the Defendant and of whom the Atkins had custody at the time of trial. At the time of her death, the victim lived in Murfreesboro, in a house that she had owned for ten years, and she worked at F2 Industries located in Smyrna. The victim and the Defendant had known each other for ten to eleven years before her death. They began dating shortly after meeting, and the Defendant soon moved in with her.

The summer after their son was born, in 2001, the Defendant and the victim moved to Texas, but they moved back to Smyrna after one and a half years. When they returned, the Atkins noticed that the relationship between the victim and the Defendant had become "[v]olatile." In May of 2006, the Defendant moved out of the victim's house and moved into a rental house located just eleven houses from the Atkins's home. The Defendant would sometimes visit the Atkins, often when Lucas was at their house. Most, but not all, of these visits were "amicable."

After the Defendant moved out, the victim initiated custody proceedings to formalize the custody arrangement of Lucas, and, with the financial assistance of her parents, the victim retained attorney Mitchell Shannon to assist her in this regard. Before her death, papers had been served on the Defendant, who had also retained counsel, but the custody arrangement had not been finally resolved by the trial court. The Atkins felt their relationship with the Defendant changed after the victim initiated court proceedings regarding Lucas's custody and the Defendant expressed resistance to paying child support and insisted that no one come between him and Lucas. Ultimately, the Defendant ceased communicating with the Atkins, even when he came to their house to pick up Lucas, and the Atkins felt the Defendant's appearance deteriorated.

While the custody proceedings were ongoing, the victim told her father that her cell phone voicemail was full of messages from the Defendant, so he assisted her in recording them to a CD and then gave her a mini-cassette recorder to use to record and preserve the phone messages in case they became relevant to the custody proceeding. Mr. Atkin identified the recordings, which were played for the jury.

During this time, the victim worked full time, so Lucas went to daycare three days a week, and the Atkins kept him two days a week. Because she wanted to spend time with Lucas, the victim and Lucas participated in karate lessons together, and the Atkins sometimes watched these lessons. One such occasion was on Friday December 14, 2007, when the

-2-

Atkins went to a karate school to watch as the victim attempted to obtain her second-degree green belt and Lucas attempted to obtain his brown belt. There, they saw the Defendant, who had come to support Lucas. The victim had originally planned to have Lucas's birthday party at the karate school on December 15, 2007, but the Defendant refused her request saying that it was his weekend with Lucas.

On December 15, 2007, Linda Atkin and the victim spent the day shopping and preparing for Lucas's postponed birthday party, eating dinner, and watching a movie at Linda Atkin's house. Before leaving her parents home on that Saturday night, the victim asked Linda Atkin to call her in the morning to make sure she was awake so she could meet her parents at church. The victim had told her parents that, after church, she would help bathe their dog and eat dinner with them. The victim also said before leaving that she intended to go to Wal-Mart before going home to purchase some items she needed for herself and for Lucas's party. She left between 8:00 and 9:00 p.m.

Linda Atkin called the victim on Sunday morning at 7:30 a.m. as they had planned, but the victim never answered the telephone. The Atkins went to church and called the victim again repeatedly upon their return home from church. At around 3:30 p.m. they drove to the victim's house where they noticed her car in the driveway and her front door locked. Linda Atkins recalled that the victim kept a key to her house hidden outside of her house. When the Atkins looked through the front window, they saw that the curtains to the sliding glass doors in the back were blowing. They went around back and entered the house, where they found the victim dead, lying on her stomach, naked from the waist down, with her hands tied behind her back. Doug Atkins called 911, and, when police arrived, they asked the Atkins to wait outside, which they did, staying in the victim's driveway or in the neighboring house of Bobby Spicer.

The victim's brother, Kenneth Atkin, described his relationship with the Defendant as "pretty good" when the Defendant and the victim were dating, with their only issue being that the Defendant did not financially assist the victim in caring for Lucas. Kenneth spoke with the victim the night before her death on the telephone at 10:43 p.m. for about five to ten minutes while the victim was shopping at Wal-Mart. Kenneth heard of the victim's death the next day and went to the victim's house where he met his mother and father. He stayed outside the house for much of the time and then went into Bobby Spicer's house. The Defendant did not come to the victim's memorial service, but the Defendant's father did attend.

Christopher Atkin, Kenneth Atkin's son and the victim Atkin's nephew, testified that he visited the victim and the Defendant when they lived together in Texas. He said the two "[a]rgued a lot when they lived in Texas," recalling that one time the two were arguing so

-3-

heatedly while in a car together that they had to pull over onto the side of the road.

Marcia Kautz testified she had known the victim since 1989, and she met the Defendant shortly after the victim and the Defendant began dating in 1995 or early 1996. Kautz noted the victim and the Defendant's "very passionate . . . physical chemistry" but said there seemed to be some underlying tensions regarding their different social, family, and moral upbringing. Kautz, who spoke with the victim every day, last spoke to her at 9:00 p.m. on December 15, 2007, when the victim was on her way to Wal-Mart to buy a few items for Lucas's upcoming birthday party. Kautz agreed on cross-examination that she never saw any marks on the victim, or any pictures of any marks on the victim, from injuries caused by the Defendant.

Todd and Tina Burfield testified that they knew the victim and Kenneth Atkin and had met the Defendant once previously. Todd saw the victim December 15, 2007, while she was shopping at Wal-Mart and talking on her cell phone to her brother. Todd briefly took the victim's phone and spoke with Ken because the two were friends. The victim told Todd she was going to go home to clean her house after leaving Wal-Mart. Todd recalled that his Wal-Mart receipt indicated that he checked out of Wal-Mart at 10:47 p.m. Tina, Todd's wife, confirmed that he was at home when she arrived there at 11:30 p.m., and he remained home the rest of the evening. The State also introduced Wal-Mart security recordings from December 15, 2007, which showed the victim arriving in the Wal-Mart parking lot at 8:50 p.m., coming into the store at 8:52 p.m., and exiting at 11:30 p.m.. After exiting, the victim went straight to her car, put her purchases in her car, and left the parking lot.

Dee Rubo, who knew the victim and the Defendant from the karate studio where her child also participated in karate classes, testified she was at the studio on December 14, 2007, when the studio was conducting testing for belt rank. After Lucas and the other kids were successful in achieving their new belts, a party was held at a classmate's home, and Dee and the victim spoke during this party. The two often spoke of the victim's struggle with child custody issues. The next day, Rubo called the victim about a shipment of items, some of which the victim needed to pick up, and the victim met Rubo at the karate studio at around 7:15 or 7:30 p.m. While the victim was at the studio, she spoke with both Rubo and Bobby Austin, a karate instructor or "sensei," about being upset that she did not know where the Defendant had taken Lucas that weekend. Both Rubo and Austin encouraged the victim to try to speak with the Defendant in a positive manner about Lucas. Rubo described the victim and the Defendant's relationship at that point as "distant" and "volatile," with the pair saying "as few words as possible to each other."

Bobby Spicer, the victim's neighbor, testified he had lived in his house for nineteen years and, as such, knew both the Defendant and the victim, whom he described as his

"friends." Spicer recalled the Defendant's moving out of the house and recalled the victim and the Defendant thereafter engaging in a custody dispute. The Defendant called Spicer one day in August complaining that the victim had called him an unfit parent, said he was not taking care of his son, and had initiated proceedings to collect child support from him. Spicer last saw the victim on the Saturday morning before her death. He said when he went to bed at 10:30 p.m. on Saturday night the victim's car was not yet home. Her car was present at the house at 6:00 a.m. when he awoke. Spicer noted that the victim's curtains to her sliding glass door were blowing at around 10:00 a.m., but he did not learn of her death until her parents arrived at around 3:00 p.m. He offered for her parents to come into his house and wait for the police to complete the search.

Spicer testified the Defendant called him from a telephone number different from the Defendant's cell phone number at 9:55 p.m. and said he heard the victim was found dead. He asked how she died and seemed upset that he found out from someone at the karate studio rather than a family member. The Defendant told Spicer he had been out of town and had just returned. The Defendant asked Spicer for details of what the police had found, but Spicer said he did not know. Spicer never saw any signs of violence between the Defendant and the victim.

Michael Elliot testified he knew the victim from junior high school, and the two lived near each other as adults. On December 15, 2007, Elliot left his house at around 11:45 p.m. to get a drink at a nearby gas station, and he passed the victim's house on the way. He saw the victim inside, and she appeared to be hanging a picture or a clock on a wall inside the home. Elliot said that around 6:00 or 7:00 p.m. he saw lights coming from a four-wheeler in the woods behind the victim's home, and he reported this "suspicious" activity to the police.

Todd Brown testified knew the victim from the karate studio, and the victim had come to his house to bring Lucas to play with his children. Brown, Brown's wife, and the victim had also all taken the children out to eat. Brown last saw the victim about a month before her death when they were both dropping their children at school. Someone from the karate studio called him on December 16, 2007, and told him that the victim had been murdered. Brown went to the karate studio, where friends of the victim's had congregated, and he saw the Defendant walk into the studio, "sniffling." The Defendant said another karate patron, Brandon McKinney, called him and told him that the victim was murdered. Brown asked the Defendant where Lucas was, and the Defendant told them he was with Tanner Long, a fifteen or sixteen year old boy who Brown knew lived with the Defendant and called the Defendant "Dad." The Defendant told Brown he had been hunting in Lewisburg that weekend before learning of the victim's death. The Defendant then went straight into the office of the karate instructor, Austin. Austin, who Brown described as "pretty upset," made the Defendant

leave, telling the Defendant he was on his way to the sheriff's office. The Defendant said he too was on his way to the sheriff's office.

Mitch Shannon testified the victim retained him in June 2007 to represent her in her custody dispute against the Defendant. He filed a petition for paternity and to establish a parenting plan in late June or early July of 2007. At the first hearing on the case, the court allowed the Defendant visitation during the week and on the weekends. In September 2007, at another hearing, the trial court reduced the Defendant's visitation by giving him visitation only on the weekends and by eliminating overnight visitation on Sunday. In December, Shannon and the Defendant's counsel wrote a number of letters to each other regarding the Defendant's violations of the court-established parenting plan. Shannon intended to ask the court to sanction the Defendant based upon these violations. The two attorneys were also at odds over the fact that the Defendant had not responded to interrogatories, as was required. Shannon sent the interrogatories on November 2, 2007, and had not received the Defendant's responses by December 2, 2007. After a number of phone calls between himself and opposing counsel, on December 11, 2007, he sent opposing counsel a letter saying that he would file a motion to compel on December 14, 2007, if he still had not received the responses to his interrogatories.

Shannon recalled that one of the issues involved in this case was that the Defendant continually called the victim. During their meetings, he would call her sometimes up to fifteen times. Shannon and the Defendant's attorney attempted to keep the parties at arms length, but the Defendant still called the victim continually. Shannon recounted several conversations between the Defendant and the victim, one of which occurred on August 30, 2007. On that day, the victim came to Shannon's office to discuss the Defendant's habit of not bringing Lucas back as instructed. The Defendant kept repeatedly calling the victim during the meeting, and the victim finally answered the phone and put it on speaker. Shannon heard the Defendant be "abusive" to the victim, calling her stupid and an idiot. The Defendant told her that they could work things out on their own, and, when she refused, he said, "Look, I can get rid of your attorney. It's not a problem. I know where he lives. I've followed him home. You just give the word and I'll handle it."

Kim McCord testified she knew both the victim and the Defendant because their sons took karate at the same karate studio. McCord recalled an evening when the police were called to the karate studio. She described the events leading up to police being called, saying that, when she arrived at the karate studio, she saw the victim standing outside crying on the telephone. She asked the victim if she was okay, and the victim nodded her head, so McCord went inside. To McCord "[s]omething didn't feel right," and she noticed that both of the victim's parents were inside the studio with Lucas who was not dressed in his karate gee, which was unusual because he usually came dressed for class. McCord went outside and

asked the victim about Lucas's karate gee, and the victim said that she did not have it and that the Defendant had it and refused to give it to her. Once karate class was in progress, McCord saw the victim run inside the studio, straight up to the karate instructor, Austin. McCord explained that this was against protocol, which required that one bow before approaching the instructor. Austin quickly left with the victim and went outside, where the Defendant had pulled up in his truck. Austin gestured for the Defendant to leave, and, when he did not, Austin called the police. The police were still at the karate studio, one speaking with the victim and one speaking with the Defendant, when McCord left.

Bobby Austin, the karate instructor, testified he met the victim and the Defendant at the same time, when the two enrolled Lucas into karate lessons. Austin said he saw the victim and the Defendant interact on a regular basis, and the two did not seem to get along. Recalling the evening police were called to his studio to deal with the Defendant's behavior, Austin said the victim came into the studio crying and upset, saying that the Defendant had grabbed her and would not leave her alone. Austin stopped his class, went outside, and asked the Defendant to leave. The Defendant refused, telling Austin that he was on public property and not required to leave. Austin returned to the school and called the police, who arrived and spoke with the Defendant. After speaking with police, the Defendant left the karate studio.

Austin recalled another incident three weeks before the victim's murder. He said the victim had approached him about having a birthday party for Lucas at the karate studio on December 15. She mentioned to Austin that it was the Defendant's weekend to have Lucas, and she was unsure whether he would allow her to have the party. Austin spoke with the Defendant, who agreed to have the birthday party on that date. The Defendant later told the victim that he was not going to bring Lucas to the birthday party. After learning of this, the Tuesday before the victim's death, Austin attempted to call the Defendant into his office to discuss the birthday party. Austin said he first spoke with the Defendant alone, and the Defendant denied that Austin had told him about the party. Austin asked the Defendant if he could bring in the victim so that the three could discuss the situation, and the Defendant said, "No. I really don't want to talk to her. I can't stand to be in the same room with her."

Austin invited the victim in anyway, and the conversation went poorly. The Defendant told them both that he was taking Lucas out of town for the weekend. Austin and the victim asked where they were going, but the Defendant responded that he did not have to tell them where he was taking Lucas. He said he had been planning "this" for awhile now. Austin recalled being confused by the Defendant's response because the Defendant did not say he had been planning the "trip" for awhile but said only he had been planning "this" for awhile. Further, Austin said the Defendant was not the "type of person to plan a trip."

Austin described the Defendant as "just pure evil" and said the victim did not understand why the Defendant hated her so much. The Defendant told Austin that the victim was trying to take Lucas away from him.

Austin testified about the evening that he learned that the victim had been killed, saying that people began coming to the studio when they learned of her death. The Defendant came to the studio and said, "I just heard. I just heard." The Defendant said he had been in Lewisburg, and Austin noticed he was driving a white two-door Corolla. The Defendant tried to appear as if he was crying, but Austin did not see any actual tears.

On cross-examination, Austin agreed that the Defendant had approached him about being a mediator between the Defendant and the victim. Austin said, after the incident where police were called, he told the Defendant that he must call all the parents of the children who were present at the karate studio and apologize before Austin would allow him to return. Austin believed the Defendant complied with this request. Austin agreed that the victim was talented at karate and had achieved an intermediate level. She had taught herself self-defense as part of her karate training.

Mike Hoekstra, a deputy with the Rutherford County Sheriff's Office, testified he responded to a call at the victim's house about a possible corpse on December 16, 2007. The victim's parents were there when he arrived, and, after viewing the victim's body, he asked her parents to leave because he considered the house a crime scene. After three or four minutes, other officers arrived, and the officers created a crime scene log. Deputy Hoekstra created a report, in which he opined the method of entry into the victim's house was "forced." George Chew, a paramedic with Rutherford County Emergency Medical Service, testified he responded to the victim's house, where he found her body on the bed with her hands bound behind her. She did not have a pulse and appeared to have a gunshot wound to the back of her head.

Detective Bryant Gregory, with the Rutherford County Sheriff's Office, testified he responded to a call about a possible homicide at the victim's house. Upon his arrival, he examined and photographed the scene. He noted that the victim's purse and jacket were on the kitchen table, and her thermostat was set to sixty-nine degrees. The detective identified photographs of the victim's body, one of which depicted a scratch to her left arm. Detective Gregory examined the victim's car, in which he found a bag from Wal-Mart. He also attended the autopsy of the victim's body, where he collected bullets the medical examiner retrieved from her body.

Dr. Amy McMaster, with the Nashville Davidson County Medical Examiner's Office, testified she conducted the autopsy on the victim's body. The victim, who was thirty-six at

he time of her death, had three gunshot wounds to her head; her hands were bound with black plastic ties; and she had small abrasions and a bruise on the back of her right hand and abrasions to the back of her upper left arm. The doctor determined that the gun was fired from a few inches away from the victim's head, and she successfully retrieved three bullets from the victim's head. From these bullet wounds, the victim suffered bleeding in her brain, multiple fractures to her skull, bleeding in her eyes, and injury to her brain. Death, the doctor opined, was nearly instantaneous.

Elizabeth Bradley testified she moved to Tennessee in August of 2007 and met the Defendant through her son Julian Bradley. Julian and Tanner Long, the teenager who lived with the Defendant, grew up together in Texas. When Bradley first moved to Tennessee, she lived with the Defendant in Smyrna for four-and-a-half weeks. Bradley said, while living with the Defendant, she met Lucas but not the victim. Bradley recalled that the Defendant was "very upset" with the victim because he wanted more time with his son than every other weekend and Tuesday nights. The Defendant said he was not willing to pay child support because he felt like he would be paying her mortgage. Bradley said it was clear the Defendant did not like the victim because he spoke about her using derogatory remarks while around Bradley and Lucas, calling the victim stupid and saying that she did not know what she was talking about.

Bradley recalled a time when she loaned the Defendant her car on a night that the victim and Lucas had gone to karate. The Defendant wanted to watch and see how late the victim kept Lucas at karate, because the parties argued over the fact that Lucas was at karate after his bedtime. The Defendant told Bradley that he wanted to use Bradley's car because no one would recognize him in that car. On cross-examination, Bradley agreed that the Defendant was trying to prove that the victim was not getting Lucas to bed at the same time she demanded that he have Lucas in bed.

Charles Hardy, with the Tennessee Bureau of Investigations ("TBI"), testified he responded to the scene of the victim's murder and assisted in the investigation. Agent Hardy identified multiple pictures and sketches of the scene. The agent did not see any signs of forced entry but noticed that the victim's purse and keys were on the kitchen table. Law enforcement personnel found the victim's body dressed only in a black camisole and positioned face down, with her head toward the foot of the bed. Officers took multiple items for further testing, including a bullet they found between the victim's head and the mattress. Agent Hardy identified photographs of possible muddy shoe tracks in the victim's house. Agent Hardy took swabbings of blood stains, all of which were later determined to be from the victim or Lucas.

Agent Hardy received multiple items to test as part of this investigation, including the

Defendant's boots and several items from the house of Eve Barger, a woman with whom the Defendant sometimes stayed. The agent testified he examined the Defendant's boots and found the presence of blood on the Defendant's right boot. He could not, however, generate a DNA profile from the stains on his boot. On the fitted sheet found at Barger's house, Agent Hardy found blood, but he excluded the victim as the source of that blood and determined the blood belonged to Barger. The agent did not find the victim's blood on any of the Defendant's clothing, his car, or the sheet upon which the Defendant slept the evening of the the victim's murder.

Oakley McKinney, a TBI agent and expert in latent fingerprints, testified that the only fingerprints he found at the crime scene belonged to the victim. Agent McKinney also examined fingerprints recovered from Barger's home, but he was unable to match the prints to either the victim or the Defendant.

The State presented evidence about the gun and the bullets used to shoot and kill the victim. Shelly Betts, with the Firearms Identification Unit of the TBI, testified she went to the scene of this murder, where she collected one fired .32 caliber metal jacketed bullet from the victim's mattress, and the medical examiner gave her three other fired bullets the examiner retrieved from the victim's body. Betts also examined two unfired .32 bullets that police recovered from the Grand Prix belonging to Barger, one of which police found in the gear shift area and the other of which police found in the console. These two unfired bullets were Winchester Western brand .32 auto caliber full metal case cartridges with knurled canalures. The four fired bullets, found at the scene and in the victim's body, were .32 auto caliber metal case bullets with canalures that had all been fired through the barrel of the same firearm. The four fired bullets were the same type, design, and bullet weight as the unfired bullets found in Barger's Grand Prix. Agent Betts determined that the fired bullets were fired from a gun that was manufactured by one of multiple manufacturers, one of which was a Llama. The gun would have held seven or eight cartridges in its magazine. Also distinctive about this gun was that it may have misfired because officers opined that, although there were four bullets found at the scene, the gun seemed to only be fired three times, judging from the final resting place of the bullets. It appeared that the gun expelled two bullets at the same time on one occasion.

On cross-examination, Agent Betts testified that a .32 caliber weapon is relatively common, and one could purchase .32 auto seventy-one grain full metal casings at Wal-Mart. The agent agreed that at least ten manufacturers could have produced the type of gun used to shoot the victim. The agent testified that there were no cartridge cases left at the crime scene, so either the bullets were shot from a revolver or the shooter gathered and took with him the casings.

Agent Betts contacted Paul Szabo, who was employed with the Winchester Ammunition Division, and he assisted her in the investigation of the victim's murder. Szabo testified that Agent Betts showed him the product symbol, knurled canalures, from bullets found in this case and asked him when Winchester last used that particular product symbol. Szabo testified the last time Winchester manufactured that type of bullet was in 1977. Further, on the shell case, there was an imprint showing that the brand of shell case used on the bullets in this case was last manufactured in the late 1960s.

Police also contacted Eve Barger, whose testimony is summarized in its entirety below, who told them that a gun was missing from a gun bag she kept in her closet. She said the gun bag belonged to her ex-husband, and she took it from him after their divorce. The police then contacted Barger's ex-husband, Phillip Keith Barger, who testified at trial that the two were married for thirteen years and lived in Lehigh Acres, Florida, while married. During this time, Phillip stored his weapons in a locked combination safe in their home. Sometime after their divorce, Eve Barger moved to Lewisburg, Tennessee, and Phillip moved from the house they had shared. She called Phillip and asked him if he had retrieved his weapons from their home. After this conversation, Phillip went to the house to retrieve the guns and found that only two guns remained in the safe. Accordingly, he filed a stolen guns report with the police.

Phillip then identified a green gun bag police found in Eve's closet, and he said the bag belonged to him. In the bag, he found a rifle scope, two pairs of eye protective glasses, a gun lock key, targets, .40 caliber Winchester Smith & Wesson rounds, and two boxes of seven millimeter Magnum shells. Phillip Barger said the last time he saw the bag it also contained a .32 Llama pistol, which occasionally jammed upon firing. Barger had "traded" with a friend of his for that particular pistol nine or ten years prior, and the gun came with ammunition. Barger testified that a sergeant from the Sheriff's Department in Florida contacted him to ask him if he had any ammunition for his .32 Llama pistol, which he did. He gave the ammunition to the sergeant. Sergeant Michael Christiansen testified he collected the .32 ammunition from Phillip as Phillip had testified.

Jeffrey Gilley testified he met Eve Barger through the internet, after which the two started dating. After meeting a couple of times, the two decided Barger would move into his home, where the two resided for approximately four months. During this time, Barger told him about a pistol that she had that was jamming or would not "feed right on the shells." Gilley offered to fix the gun for her, and the two went to her home in Lewisburg and retrieved a .38 Special, a Llama .32 semi-automatic pistol, and a stainless steel .410 shotgun. Gilley identified the green gun bag presented by the State and said that it was the same bag they used to transport the weapons to his parents' house, where he was going to attempt to fix the gun. Gilley said he fired and cleaned a .32 Llama semi-automatic pistol, which had

-11-

been cracked somehow on the right-hand side and had a slide that had been welded on. Gilley did not notice the gun jamming when he fired it, so he loaded it and returned the gun to the green bag after he had cleaned it. Gilley said, when Barger moved out of his home, she took with her the green bag and the guns.

Scotty Pace, a personal trainer and vending machine owner, testified he had known Eve Barger for several years, and the two had met via the internet. The two spoke online for a month or two before they met in person in Fort Meyers, Florida, where Pace spent two or three nights with Barger, meeting her friends and family. Pace described their relationship as platonic and said the two remained friends at the time of trial. Pace said that, while he was in Florida, he helped Barger, who was going through a divorce, move rifles from the house she shared with her husband to her parents' house. Pace said that, after Barger moved to Tennessee, the two started a vending machine business together, but Barger ceased her involvement with the venture because she had other full-time employment and did not feel she had enough time to participate in the vending machine business. Pace, therefore, took over the business.

Pace testified that, in December 2007, Barger called him from the police department and asked him to come and get her. He did and took Barger back to his house, where she called the police and told them she wanted to retrieve some clothing from her house. Barger refused to tell Pace why she was at the police department, and she appeared scared and nervous. Pace took Barger to her house, where the police met her, and she got some of her clothing and other necessities. She then spent the night at Pace's house.

At 4:00 a.m. Barger, who was in "tears," awoke Pace and told him that she would tell him what happened but that she was scared. Barger told Pace that she was dating a man who told her he had killed his "ex" and Pace understood her to mean the man's ex-wife or ex-girlfriend, with whom the man had a child. Barger said she told the man that, if he was kidding she wanted him to stop, and if he was serious she wanted him to leave. Barger told Pace that the police were questioning her about the victim's murder, but she told them nothing because she was scared. Pace told Barger she needed to speak with an attorney and then tell the police what she knew. Pace recommended his attorney to her, and, after Barger spoke with the attorney, Pace took her to the police department where Barger told police what she knew.

On cross-examination, Pace agreed that he had threatened to blow up Barger's car, but he said that he was "messing around" because she was like a sister to him. Pace agreed that he had been to Barger's house before and that, the week leading up to the victim's murder, he had spoken with Barger on the phone.

Eve Barger testified that she lived in Lewisburg, Tennessee, and had lived there since March 2007, when she moved to Tennessee from Fort Myers, Florida, after separating from her husband. Barger, who was the customer service team leader at a Publix Supermarket, said her parents, who resided in Florida, owned the forty-eight acres upon which her home in Lewisburg sat, and she lived at the house alone at the time of the victim's murder. Barger recalled meeting Scottie Pace, who later became her best friend, through the eHarmony website, and she met Pace in person when he visited her while she still lived in Florida. She confirmed that Pace helped her move some of her husband's guns from the home she shared with her husband to her parents' home. Barger identified a photograph of her closet and identified in it the gun bag that Pace helped her move while she lived in Florida. Also in the closet were a .410 gun, other shotguns and rifles, and a crossbow.

Barger recalled that, after she moved to Tennessee, she met the Defendant in September 2007 through the website eHarmony. The two chatted online for a couple of weeks before meeting in person at an Exxon gas station, after which the Defendant followed her to her house. Barger drove her Pontiac Grand Prix GT, and the Defendant followed her in his Ford truck. The Defendant began coming to her home "once or twice a week at first," sometimes staying with her overnight. One time, Barger went to the Defendant's house in Smyrna. Eventually, the Defendant brought both of his sons, Tanner Long, who was seventeen years old, and Lucas, who was five years old, to her home, where she met them both. Barger said both boys had spent the night at her house twice.

Barger testified that, at some point, she learned that the Defendant had gone to her house when she was not present. One morning after he spent the night at her house, Barger left for work with the assumption that the Defendant planned to leave her home to go to work. The Defendant in fact left her house, but he later called her and said he was eating a sandwich at her home. She asked him how he got back into her home, and he said he used a credit card. The Defendant also told her when he went for hikes with his sons on her property, and, when she returned after these occasions, she would find things moved in her house, so she assumed he entered her home.

Recalling the events of the weekend of the victim's murder, Barger testified that, the Tuesday before that weekend, the Defendant called her and said he wanted to take the boys for a hike on her property. He then told her that his ex-girlfriend, the victim Atkin, whom he "hated," had planned a birthday party for Lucas, so he could not take the boys hiking because he had to attend the party. The Defendant was upset that the victim had planned a party for his weekend with Luke and said she should have waited until it was her weekend. Barger, therefore, did not expect to see the Defendant that weekend, but, on Friday, the Defendant called her and told her the party was cancelled. She spoke with the Defendant at 11:30 a.m. on Saturday December 15, and he said he was going to her house to take the boys

hiking and asked if it would be okay if Long's friend "Donovan" joined them. She spoke with him again at 3:00 p.m., and the Defendant was outside with his boys hiking. She called him back later and jokingly asked him to make dinner for her if he was planning to be at her house when she arrived home. When she arrived home at 8:00 p.m., the Defendant had dinner prepared for her, and Donovan was not present. Barger gave Lucas a birthday present, a remote control helicopter, and went to Wal-Mart in Lewisburg at around 9:00 p.m. to get batteries for the helicopter. Barger also got pancake mix at Wal-Mart, so she could make pancakes in the morning.

When Barger returned to her house, she retrieved some clothes from the dryer, folded them, and then watched TV in the living room with the Defendant, who was wearing boxers and a shirt, Long, and Luke, for about forty-five minutes. At around 11:00 p.m., Barger told the Defendant and the two boys that she was going to bed, and she went into her room, where she changed into a nightgown and called her sister and also another man she had begun dating, Shawn Ferguson. Barger assumed her guest would sleep in the rooms that they slept in the first time they spent the night, Long in the spare room and Lucas and the Defendant in the living room. Barger went to sleep alone in her bedroom between 11:30 and 11:45 p.m. At some point thereafter, the Defendant entered her room, gave her a kiss, and told her goodnight.

Barger recalled that, after she fell asleep, the Defendant came back into her room and asked her to listen for Lucas, explaining that he was going to take Long to a tree to look for a deer. Barger was awakened later by Lucas crying, so she opened her door and saw Lucas, who asked her where his Daddy was. Barger told Lucas that the Defendant would return shortly and asked him if he would like to lay in bed with her, which he did. The two got some of Lucas's favorite toy dinosaurs and brought them to bed and played for awhile. Barger tried twice to call the Defendant but her calls went to his voicemail. The Defendant, wearing jeans and a black long sleeved shirt, returned at around 5:00 or 5:30 a.m., while she and Lucas were still awake, and got into the bed between she and Lucas. Barger said the following then occurred:

> I was laying there and I had my back to him. And I could hear him shifting around and he was sobbing like he was crying and sniffling. And I rolled over and looked at him and I said, "Scott, what's wrong with you?" And he shook his head as to say nothing. A couple of seconds later I asked him. I said, "Scott, what is wrong with you?" And he looked at me and he said, "You're going to hate me." And I said, "I will never hate you." And I said, "What is wrong?" And he looked at me and he said, "I just killed [the victim]."

Barger said she asked the Defendant, "What?" and "Why?," and the Defendant said

he did not know and that he just could not take "it" anymore. She said she asked him if he was being serious, and he said, "Yes," and then asked her what he should do. Barger said:

> I said, "You need to turn yourself in." And he said, "I can't do that." He looked at me again and asked me, he said, "Promise me something." And I said, "Yes, anything." And he said, "Promise you'll always be my friend." And I said, "I will." I started to ask him how he did it and I stopped myself and told him, I said, "Make me a promise." And he said, "Anything." And I said, "Promise if I ever ask that question again you won't tell me." And he said okay.

That concluded her conversation with the Defendant. Barger laid in bed awake until Lucas awoke, and she then made him pancakes and bacon. She saw Long still in the spare bedroom. The Defendant awoke fifteen or twenty minutes later, and the four of them ate breakfast together and then watched football.

Barger testified that, at this time, she still was unsure whether she believed the Defendant. She spent the day with him, Long, and Luke, and, when there was a break in the rain, they would fly Lucas's helicopter. Barger left the house only one time that Sunday and that was to go to an ATM to retrieve gas money for the Defendant.

Barger described burning some trash with the Defendant, saying that she had asked the Defendant on Saturday to help her burn some of her trash, and he said he would do so on Sunday. She reminded him of this on Sunday, and she and the Defendant went to her barn on her property to look for something to burn her trash in and found a barrel. They brought the barrel back to her house and placed it in her driveway where she usually burned trash. She placed two bags of her trash in the barrel along with the box Luke's helicopter had arrived in and then went back inside to cook dinner. She left the Defendant, who still wore jeans and a black shirt, outside near the barrel. Barger placed three or four other bags of trash in her carport, so the Defendant could burn them, which he did. Barger denied that she owned a denim purse or that such a purse was in the trash that she burned. She said that she would give away her old clothing rather than burn it.

Barger said that, after dinner, she gave the Defendant gas money and then helped him jump start the battery in his truck. The Defendant left in his truck with his two boys at around 7:30 p.m. When the Defendant left he was no longer wearing his jeans and dark shirt but had changed into a polo and khaki pants that were at Barger's house from when she had laundered some of his clothing.

At around 8:45 p.m. that evening, the Defendant called Barger and said his friend

Brandon McKinney had called him and told him that they had found the victim dead. Barger said she acted like "it was the first time I had heard it" because she was "in shock." Barger testified that, while she was not scared of the Defendant, she was scared that she knew what he had done. The Defendant told her he was going to try to find "the karate instructor" and see if he knew anything. At around 10:45 p.m. the Defendant called her back, and she asked him if he had found out anything, and the Defendant responded negatively.

Barger said she did not call the police because she was scared to get involved in the "whole situation." The next day Barger saw on the 12:00 p.m. news that the victim had been murdered, and she became scared. After speaking with the Defendant briefly a few times during the day, Barger received a phone call from the Defendant at 9:30 p.m., and he told her he was going to the Sheriff's Department. He then called her while he was there and asked if she could keep Lucas for a couple of days until the Defendant was cleared, and she agreed. She was, however, unable to watch Lucas twenty-four hours a day because she had to work, so the child custody worker in charge of Lucas would not release him into her care.

Barger recalled that Detective Troy Hooker called her and left her a voicemail message while she was at work on Tuesday and that she called him back the same day. She said she drove to the Sheriff's Department, where she met with Detective Hooker for approximately three hours before taking him to her house to look at the firearms located in her home. Barger said she did not tell the detective the entire truth at this point because she was attempting to protect the Defendant, whom she loved. At her house, the detective looked in her closet, where she kept her guns, and in the gun bag located in her closet. Barger looked into the bag with the detective, and she noticed that two guns were missing, a semi-automatic pistol and the revolver she had placed on her night stand Monday morning after she saw the news that the victim had been murdered. She told Detective Hooker that the semi-automatic weapon was missing, as well as the extra clip belonging to the weapon, and, on Wednesday, police came and retrieved the bag from her. Barger gave the police permission to search her home for the missing weapon and to search her car. Barger agreed the police found two bullets in her car, which she denied having placed in her car.

Because she did not have a means of transporation, Barger called her friend, Scottie Pace, to pick her up from the Sheriff's Department. She told Pace that the Defendant told her he had killed the victim and that she had not yet told the police. Pace contacted his attorney, encouraged Barger to speak with the attorney, and then took Barger to the Sheriff's Department, where she told the police Detectives Mayercik and Hooker the truth.

Barger said the Defendant knew that she kept firearms in her closet because he retrieved a rifle she stored in her closet every time he hiked on her property. Barger said she normally kept her car keys in her purse, which she kept in the dining room. Barger said that

she did not burn any clothes on the day that the Defendant burned trash at her home and that she had never burned any clothes in that barrel. Barger said she took old clothes to Goodwill rather than burn them.

Barger testified Detective Mayercik asked her to record her conversations with the Defendant, and she agreed. Those tapes were played for the jury. In the first recorded telephone conversation, Barger said she was calling to see how the Defendant was doing. She said she was getting scared and needed to talk to him about a couple of things. The Defendant said he could not tell Barger where he was because he knew that there was something going on because she had her telephone off and would not answer it. She said that "they," referring to the police, were calling her all the time. He asked to talk to Barger on another phone line because Barger's phone may be tapped. Barger said "I told you I didn't want to know anything, but I need to know." The Defendant did not respond. The Defendant told her that both he and Long had a warrant out for their arrest, but the Defendant wanted to wait until after Christmas to turn himself in. The Defendant asked Barger if she was trying to set him up in any way. She said "I just wish you had never told me . . . because it's killing me," and the Defendant did not respond. She said, "I don't hate you . . . I am just scared." The Defendant again did not respond. The Defendant told Barger that his truck was impounded because someone told the police that his truck was the last to leave the victim's house on the Saturday she was killed. The Defendant told Barger that she knew that was not true. Barger said, "Did you take my car?" and the Defendant responded, "No. I need to talk to you and I need it to be in a secure place where it is just you and I. I need to be able to trust you." The Defendant said, "I'm scared that the cops have gotten a hold of you and are using you to get me to come in." The Defendant opined that the police did not have "anything great" on him. Barger said, "If you did use my gun or whatever that could come back on me." She added, "I told you I didn't want to know details." The Defendant said "I don't know. I don't know what to do," and then, "I want to trust you so bad but I am scared." The Defendant said "You tell the truth. You tell them you went to bed and you woke up at 4:30 [a.m.]."

Barger told the Defendant she did not know why he could not just talk to her and why it had "got that far." The Defendant said "I'm afraid this sounds off." The Defendant told her that the police had Barger's phone tapped and that the police could hear everything that they were saying. The Defendant said, "[Y]ou have nothing to worry about you were sleeping the whole time. I am the one who had something to worry about." She asked, "[W]hy didn't you tell me I could have changed your mind," and the Defendant did not respond. The Defendant said, "I really miss you and I am really sorry for everything but I really need to get off of here. Can I trust you?" Barger responded, "Yes."

The Defendant said, "If I turn myself in I am going to jail and I'm never seeing

[Lucas] again." Barger said, "I know." The Defendant told her "we are going to get through this. . . . Talk to me before you do anything else." Barger told the Defendant she would always be his friend, but she wanted him to do the right thing and be honest.

In the second recorded phone conversation, Barger told him that "they" took her phone today. He asked her whether "she ever washed the mud off her floor board." She asked him where the mud was from and he said he had just gotten mud in there, and he wanted to know if she ever washed it out. The Defendant said he was going to say "bye" to everybody and then come back and turn himself in. Barger asked, "[A]re you going to tell them?" The Defendant said he was just going to go to the police and tell them that he knew they had a warrant for him. The Defendant said he was "sorry for involving her in this in any way." Barger said, "I don't want to get in trouble for something I didn't do and something I didn't know anything about." The Defendant said, "[Y]ou're not." The Defendant said he was going tell the police the "truth" when he turned himself in. The Defendant said "I know you didn't know any better but I wish you hadn't mentioned that a gun was missing. They would have left you alone." He said, "Eve you know I can't talk on this phone."

Barger said "at this point they are saying everything is being linked to me." The Defendant said, "[T]here's no way. There's no possible way those casings could match." The Defendant told her that the police were trying to get her to "tell on" him. The Defendant said he told a friend of the family that there was something about a gun "going on" and the friend told him not to worry because the victim was not shot. The Defendant said that the police were trying to get Barger to say something, but, if she did not know anything, she could not tell the police anything.

The Defendant said, "I just have to make inner peace with that if they convict me then I'm spending the rest of my life in prison. I just need a day or two to do that." I want to go say my goodbyes because "I am never going to see anyone again if they convict me. . . . I am going to be on death row. I am never going to see [Lucas] again." The Defendant said Barger was not going to come see him after "everything he had put her through." He said, "I've put you through a lot."

The Defendant said, "If the [police] say we think it's her, I will tell them the whole truth. Okay. And let's just leave it at that because we both know the whole truth . . . . Don't worry." He then said, "They are trying to get you to say something that you know nothing about."

Barger said, "Why didn't you talk to me things could have been so much different," to which the Defendant responded, "I know." Barger said, "you're a good person you just make awful decisions." The Defendant said, "I have my whole life." The Defendant said,

-18-

"I would be better off dead," indicating that, if he were dead, Barger would not be in trouble, Long would not be in trouble, and he would not be a disgrace to his family.

In the third series of phone conversations, Barger told the Defendant that the police told her that they were going to arrest her, and she said that the police had not given her back her car yet. The Defendant said he would be back the next morning and he was going to turn himself in then. Barger said she was scared, and the Defendant asked why she was scared when she had done nothing wrong. Barger said the fact of her innocence meant nothing because police did not believe her. The Defendant said, "[T]hey will know once they talk to me." The Defendant said, in case anything happened to him between "here and there," he was writing "all this down on paper . . . .what happened."

Barger told the Defendant that, if he told the truth, he would still be able to see Lucas. The Defendant, crying, said, "I've already f***ed this whole life up." Barger told the Defendant to tell the truth because "of how much better [he would] feel," instructing him to "think about how much more you won't have to carry around." The Defendant responded, "that would mean the rest of my life, Eve." The Defendant said, "even as much as I was seeing [Lucas] that wasn't enough for me . . . . I just wanted to be his parent." The Defendant said Lucas would have to grow up without both his parents. Barger said, "[C]hildren go everyday to see their parents in jail," to which the Defendant responded emphatically, "Not for killing their mother!" The Defendant said, "I can't live with this."

The Defendant said the police were worried about "this f***ing gun and the gun . . . has no relevance." The Defendant said he had calmed down a lot and had talked to some people. The Defendant said again, "[T]he gun has no relevance. They're telling you s*** to try to get you to talk about something. You don't know anything." The Defendant said his friend who was an investigator for the Texas Rangers said that, if the police had anything "on" him, they would not be waiting for Barger to come in and talk to them but would be "coming" for him. The Defendant said that, when he told the investigator he wanted to just sign a full confession so the police would leave everyone else alone, the investigator discouraged him from doing so. The Defendant said he spoke with an attorney who told him not to talk to the police and not to tell the police something just to get other people out of trouble. The Defendant said the police could not take Barger to jail because the police had no evidence. Barger told him that the police advised her not to go to her house because they were still searching out there, and the Defendant said, "They can search all they want because there's nothing out there."

After the tapes were played, Barger resumed her testimony and said she called Detective Mayercik shortly before Christmas and told him she was out of tape with which to record the Defendant, and he told her not to worry. She asked if she should still answer

-19-

the Defendant's calls, and the detective said yes. The following Wednesday, the Defendant called her, and, after a lengthy conversation during which she was crying, she told the Defendant she had told the police that the Defendant said he killed the victim. The Defendant said, "I want you to know that if [the police] put you in a room with me I'm going to look at you and tell them you're a liar."

Barger said she had never seen the Defendant with a gun, and he had never spoken to her about guns. Barger was online friends with Long, who had multiple pictures of himself in camouflage on his page. Long's MySpace page also indicated he liked hunting.

Barger testified that, when the Defendant returned from, as he told her at the time, taking Long to look for deer, he was wearing the same clothes he wore when he told her he was taking Long to look for deer. She said he seemed relaxed as he got into bed with Lucas and her. She said that, after Lucas fell asleep, the Defendant told her he killed the victim. The Defendant was "sobbing" and hugged her intermittently for the next four hours, until she got out of bed at 9:30 a.m. The rest of that day was "normal," and the Defendant did not act differently.

Barger agreed that the driveway to her house ran alongside her bedroom window and that it was a long driveway. She said her driveway was gravel and that, therefore, she could hear a car coming from a distance. She did not hear, however, the Defendant leave or return in a car on Saturday night or Sunday morning, December 14th and 15th.

Barger said the gun that was missing from her gun bag, the gun police suspected was involved in the murder, was an older gun that jammed. Barger said that, after the Defendant began burning trash, she saw the Defendant come inside and roll up his clothes on her bed. That was the last time she saw the Defendant's clothes he had worn the night before.

Answering questions from the jury, Barger testified she did not know when Long returned from deer hunting because he was in his bed when she awoke on Sunday morning. Barger said the Defendant changed his clothes after he started burning her trash, and, while burning the trash, he was wearing jeans and a long-sleeved, dark shirt.

In further redirect examination, Barger said the Defendant changed his clothes while she was at the bank retrieving money from the ATM. Because she was not at the house, she did not know what he did with the clothes he changed out of.

James Phillip Martin, with the Rutherford County Sheriff's Department, testified he examined the contents of a "burn barrel" that had been gathered from Eve Barger's house. In the barrel, which was a fifty-five gallon drum, Martin found aluminum cans, green beans,

metal bands, oval pieces, a small burned box, what appeared to be some gloves, the tab from the back of a pair of Wrangler jeans, and copper rivets that appeared to be from Wrangler jeans. The Defendant was wearing Wrangler jeans at the time of his arrest. On cross-examination, Martin testified that the material he gathered that appeared to be gloves also could have been a hat. Martin said he was unaware of whether Barger was cleaning out her house around the time of the murder. Martin also agreed that no zipper to any jeans or pants was found in the barrel.

Linda Littlejohn, with the TBI, testified that she compared a print from the Defendant's boots with the partial shoe prints found in the victim's home and found that the two were not consistent. Agent Littlejohn also examined the cable ties that bound the victim's hands and found them inconsistent with a container of cable ties found at the Defendant's home.

The State rested, and the Defendant called to testify the lead investigator in this case, Detective Ralph Mayercik. The detective said that, at the start of the investigation, the police had several suspects, including the Defendant; a man named "Kenny" with whom the victim communicated via MySpace; Todd Burfield, the last person to see the victim at Wal-Mart the night of her death; and a firefighter whom the victim was dating at the time of her death. The officer said that the Defendant became a suspect early in the investigation despite the fact police initially had no information that he had ever previously harmed the victim.

Detective Mayercik testified he went to the Defendant's house more than thirty-six hours after this murder with a search warrant. The detective explained that the delay was caused by the "exceptional amount" of work required to process the crime scene. The Defendant, who was bathing his child at the time, answered the door, did not attempt to avoid him, and, obviating the need for a search warrant, consented to a search of his home, garage, and truck. The Defendant agreed to go to the police station to give a statement, even though he was not "in custody" at that time.

The detective believed the victim was shot from a gun in close proximity to her head and said police did not believe that anything was used to muffle the sound of the gun. None of the victim's neighbors, however, heard any gunshots. From his investigation, it appeared that the person who had entered the victim's home had climbed over her back fence and entered her house through her sliding glass door.

Detective Mayercik testified the police eventually seized and searched the Defendant's truck, and they found nothing in it to connect the Defendant to the victim's murder.

The detective said that another officer investigated a "suspicious" vehicle in the area

of the victim's home on the day of her murder and also a "suspicious" man in the same area. Both, he learned, were in the area before the victim returned home from Wal-Mart. The detective agreed that there was a carjacking, possibly involving a gun, in the area of the victim's home on the night of her murder.

On cross-examination, Detective Mayercik testified he timed the trip from Barger's house to the victim's house and reported the fifty-mile trip took him fifty-one minutes. He said that, during his investigation, he was unable to find any other suspect who had any other motive to kill the victim.

Glenn Rogers, an officer with the Smyrna Police Department, testified he responded to the call reporting the dispute between the Defendant and the victim at the karate studio. When he arrived, the Defendant told him that he had come to the studio to tell Lucas why Lucas could not spend the night with him. The officer noted that, while he spoke with the victim, he did not notice any marks on her body. The officer did not make an arrest, which he testified he would have done had he suspected that there had been an assault. On cross-examination, Officer Rogers testified he asked the Defendant to leave the property.

Wendy Pritchett testified she knew the Defendant because her children attended karate with Lucas. Pritchett worked at Auto Zone with a girl named "Christy," who was dating a member of the Atkin family. Christy told Pritchett that the victim had been killed and how she suspected the victim had been killed. After learning of the victim's death, Pritchett spent time with the Defendant whom she "trusted." On this occasion, Pritchett told the Defendant how Christy said the victim had been killed. On cross-examination, Pritchett said that, because the Defendant told her he wanted to speak with the Atkins, she went to the Atkins' house shortly after the victim's murder and asked them to speak with Defendant.

Brandon McKinney, Pritchett's husband, testified he knew the Defendant and the victim from the karate studio. He said he and the Defendant were "fairly close friends," and he was the one who informed the Defendant that the victim had been murdered. McKinney met the Defendant at the karate studio after he told him about the murder, and he saw the Defendant bent over and throwing up. McKinney described the Defendant as "upset." McKinney drove the Defendant from the karate studio to the Defendant's house. At the Defendant's house, the Defendant seemed "tore up," wandering around and saying he did not know how he was going to tell his son. The following Monday, McKinney drove the Defendant to the bus station because the Defendant wanted to go to Texas. The Defendant assured McKinney that he had not committed this murder.

On cross-examination, McKinney testified that, on the Wednesday after the murder, the Defendant called him and told him that his truck was broken down, so McKinney went

to pick up the Defendant. He later learned that the Defendant's truck actually had been seized by the police. McKinney testified the Defendant used McKinney's cell phone several times to call Eve Barger after the murder, despite the fact that the Defendant had his own cell phone. The Defendant told him that he knew that the police were listening to his conversations.

Tanner Long, the Defendant's son, testified he was eighteen and had recently graduated from high school. Long recalled going to Barger's house with his father the weekend of December 14, 2007. He said he and the Defendant had planned this trip for a couple of weeks because Long planned to go to Texas for Christmas, and the Defendant wanted Long and Lucas to have "bonding" time before Long left. Long recalled they left Smyrna for Barger's house at around 1:00 p.m. on Saturday, and he and his friend "Donovan" were in a car following the Defendant, who was driving Lucas. They arrived at around 2:00 p.m., had lunch, and started hiking, carrying with them a shotgun and a rifle from Barger's closet. Long testified that the only gun remaining in Barger's ammunition bag was a revolver.

Long testified that everything was fine during the hike and that no one seemed mad. On their hike, the men noticed a tree stand used for deer hunting and, by it, a deer bed, which made Long want to go hunting the following morning. The men went back to Barger's house where his father prepared dinner. Barger returned at around 8:30 p.m., and they ate dinner. Long said he sensed no tension from anyone before Barger went to bed at 11:00 or 11:30 p.m. Long said he watched a movie that started at 12:00 a.m. and that he heard the Defendant asleep and snoring on the couch until at least 1:45 a.m. Long said he got up and used the computer to talk to his friend from 1:45 a.m. until 2:45 a.m., and the Defendant slept on the couch the whole time. Long testified that he fell asleep around 3:00 a.m. The next thing he recalled was the Defendant's alarm going off at 4:00 a.m., and the alarm woke him up, so he turned it off before the Defendant did. He and the Defendant got up, and the Defendant walked him to the tree stand. Long stayed in the tree stand until 8:00 a.m., when he returned to the house and had breakfast with Lucas. Long said everything seemed "like a normal day" when he returned. They watched football and played games with Lucas.

Long testified that Brandon McKinney called the Defendant while he and the Defendant were on their way home and informed the Defendant that the victim had been found dead. The Defendant began to cry and asked how he was going to tell Lucas. He asked Long to drop him off at the karate studio and to take Lucas home.

On cross-examination, Long testified he did not wear any orange the day he went deer hunting and said he did not have a valid Tennessee hunting license. Long identified pictures posted on his MySpace page that were taken on December 22 of himself, the Defendant, and

other family members. One of him and his father had a caption that read, "You mess with me and you mess with him." Long testified that his father likely had on Wrangler jeans when they went hiking the day before the victim's death, saying that Wrangler and Levi jeans were all his father wore.

Long said that, when the Defendant dropped him off near the tree stand the morning of December 16th, he told Long that he would come back out if he heard a gunshot. The Defendant then went back to the house. Long said he stayed in the stand for two-and-a-half to three hours. When Long returned to Barger's house, he tried to go to bed, but Lucas came in and jumped on him, so they got up and ate breakfast.

Long agreed that, after the Defendant learned about this murder, the Defendant asked Wendy Pritchett to go to the victim's parents' house. Long did not know why the Defendant himself did not go to the victim's parents' house, which was on the same street as the Defendant's house.

The Defendant testified that he met the victim in 1996 while the two were both working out at a fitness club. The first couple of years of their relationship went "really well," and, while the couple had "rocky" times and gradually grew apart, they never yelled or argued with great frequency. After having grown apart for some time, the Defendant moved out of the victim's home in May of 2006 and into a rental house, which she helped him find, near her parents' home. For six or seven months after the Defendant moved out of the victim's home, the two maintained an intimate relationship, which ceased in December of 2006.

The Defendant said that, when he and the victim first separated, he had Lucas Tuesday and Thursday nights and every other weekend. Lucas stayed with the victim's parents on Tuesdays and Thursdays during the day and was in daycare on Monday, Wednesday, and Friday. In July of 2007, the Defendant, who had fallen upon hard times financially, spoke with the victim about pulling Lucas out of daycare, which the Defendant was paying for at the time. The Defendant suggested that Long, who was out of school for the summer, could watch Lucas during the summer in order to save two months' daycare tuition. The victim, however, wanted Lucas to stay in daycare until he started school, and the Defendant told her he could not afford the daycare's tuition.

The Defendant said, shortly after this conversation, he was "shock[ed]" when he was served with papers showing that the victim had initiated court proceedings. He approached Austin, from the karate studio, and asked him to act as a mediator to assist him and the victim to work out a custody agreement. He obtained a copy of the victim's parenting plan and gave it to Austin, who would alternately speak with the Defendant and the victim. According to

-24-

the Defendant, the victim wanted attorneys to work out the agreement, so she refused to work with Austin to mediate a custody agreement.

In part because the mediation with Austin was unsuccessful, the Defendant retained an attorney, Laurie Young, to represent him in the custody dispute over Lucas. He conceded that he had never paid child support but said he had never attempted to avoid paying child support. Further, he paid $400 per month for Lucas's daycare. He said, in November 2007, he received a set of interrogatories that he did not complete before they were due thirty days later. He explained that many of the questions related to his income and required him to obtain multiple tax records, which took "some time."

The Defendant explained his version of the events that led to Austin calling the police at the karate studio. He said Lucas was at work with the victim that day, and he picked Lucas up and took him to lunch. When he did so, the victim informed him that he could no longer watch Lucas at the karate studio because Austin did not want the Defendant there. The Defendant called Austin, who confirmed he did not want the Defendant at the studio. Despite this, the Defendant went to the karate studio, wanting to inform his son why he could not be there. Austin came out to the car and said he was going to call the police if the Defendant did not leave. The Defendant refused to leave, and Austin called the police, who arrived a short time later. The Defendant said he just wanted to see his son.

The Defendant said the following August, he and the victim had a court hearing on the custody case. As a result of that hearing, he lost some of his days of custody with Lucas. One point of contention between the Defendant and the victim was the Defendant's perpetual failure to return Lucas to her at the karate studio by 8:00 p.m. as scheduled, which resulted in the victim being unable to have enough time to take Lucas home, bathe him, and put him to bed. The Defendant said, even when he brought Lucas to the studio at 8:00 p.m., the victim did not leave the studio until later. To prove his point, he borrowed a car and watched how late she stayed at the studio. The Defendant denied ever following the victim's lawyer, Shannon, or ever saying that he knew where Shannon lived. The Defendant said he did not know where Shannon's office was located or what kind of car he drove. The Defendant acknowledged that he sometimes called the victim frequently, leaving angry messages, but he explained that he just wanted to see his son.

The Defendant said he learned from Austin on December 4th or 6th that the victim had planned a birthday party for Lucas on a Saturday in December. Austin did not give him the date but merely asked if the Defendant and the victim could be in the same room together and both attend the party. He said it was not until December 11th that he learned the victim had planned the party for December 15, which was his weekend with Lucas. He planned to take both his boys hiking at Barger's house for the weekend. The Defendant recalled that

Long was leaving to spend Christmas in Texas, and he wanted Long and Lucas to spend time together before Long left. The Defendant said Lucas loved to spend time with Long.

The Defendant said, despite his plans, he told Austin that the party could go ahead as scheduled. The victim called him on Wednesday, however, and told him she had cancelled the party. On Thursday, Austin called the victim and the Defendant into his office to discuss the situation. As a result of this conversation, the Defendant agreed to have Lucas to karate by 8:15 p.m. and not to wait in the parking lot to see what time she left the karate studio. The two also agreed to communicate better for Lucas's sake.

On that Friday, December 14, 2007, the Defendant picked up Lucas from the victim's parents' house. Shortly before 5:00 p.m., he took Lucas to the karate studio so that Lucas could take the test for his next karate belt. At the studio, the victim met him outside and gave him a pair of Lucas's pajamas that Lucas wanted to wear to the pajama party at school on the following Monday. The Defendant agreed to put Lucas in these pajamas before he took him to school on Monday. He said he and the victim did not exchange any angry words or looks. After the karate test, he and Lucas went back to his house and spent the night. The next morning, he and Lucas got up and waited for Long to awaken. Then, the three of them joined Donovan and went to Barger's house, stopping once for gas.

When they arrived at Barger's house, they ate sandwiches and went for a hike. Long brought with him one of the guns that Barger kept in her closet because Long and Donovan wanted to shoot the gun. The Defendant knew that Barger had a gun bag that she kept in her closet, because she had offered Long a gun on a previous occasion when Long saw a ground hog he wanted to attempt to shoot. This occasion was the first he learned that Barger had any guns, and he did not recall any other conversations with her about the guns she kept in her closet. The weekend of the 14th, however, he looked in the gun bag when Long brought the bag out to look for bullets. Long was looking for more .410 shells, and the Defendant saw quite a few .40 caliber bullets lying in the bottom of the bag. He and Lucas put those shells into an empty box. The Defendant said he saw the .38 revolver in the gun bag, as well as the other guns. He never saw any semi-automatic gun in the gun bag, and he told Barger this when she asked him about it the following Monday or Tuesday.

The Defendant recalled that, while hiking with the three boys, Lucas, Long, and Donovan, they saw the tree stand. Close to the stand, the grass was "laid down," and it looked like deer had been bedding there at nighttime. He and Long talked about Long going the next day to the tree stand to hunt. The men returned from hiking, Long and Donovan got more bullets to go shoot the .410, and he and Lucas stayed in the house playing and watching television. Long and Donovan returned, and Donovan left at 7:00 p.m., after which the Defendant cooked dinner for the boys and Barger, who returned from work between 8:00 and

8:30 p.m.  The Defendant confirmed that Barger gave Lucas a birthday present, a remote controlled helicopter, and then left to go to Wal-Mart to get batteries for the helicopter.

Later that evening, Barger asked him to help her burn her trash, and he agreed. Everyone was in the den watching television or on the computer until Barger went to bed at 11:00 p.m.  The Defendant went into her room to tell her goodnight.  The Defendant said that, when he was at Barger's house alone, he slept with Barger.  When his boys accompanied him, however, he slept on the couch with them.  The Defendant said he did not know where Barger kept her purse or her car keys, and he had never gone into her purse to get out her car keys.  The Defendant said, after he said goodnight to Barger, he went back to the den, got on the couch with Lucas, and fell asleep.  Long was still using the computer at this time.  Before falling asleep, the Defendant agreed to wake Long at 4:00 a.m. so Long could go hunting.

Sunday morning the alarm went off at 4:00 a.m., Long woke him up, and he went and asked Barger to listen for Lucas while he took Long to the tree stand.  The Defendant said he got back at around 5:00 a.m., and he noticed that the television was on in Barger's bedroom.  Lucas was in the bed with Barger.  The Defendant said he was wearing his clothes from the day before, and he got into bed with Barger and Lucas.  Lucas asked the Defendant where he had been, and the Defendant told him that he had taken Long to the tree stand. Lucas asked why the Defendant had not awakened him so he could join them, and the Defendant said because Lucas was sleeping.  Barger said she had tried to call the Defendant twice when Lucas woke up around 4:30 a.m.  The Defendant explained he turned off his phone so as not to frighten the deer.

The Defendant said he woke the next morning, ate pancakes, and watched football. The Defendant acknowledged that he burned some trash for Barger but denied he burned his clothes with the trash.  He testified he did not go to the victim's house the weekend of her murder and had not been there in over a year.  The Defendant said he and the boys left Barger's house at around 7:30 p.m., and it was not until after this that he learned of the victim's death from Brandon McKinney.

The Defendant described how he then went to the karate studio and threw up in the parking lot because he was so upset about learning of the victim's passing.  The Defendant said he went home and attempted to call the victim's family and the victim's neighbor to find out what had happened.  Detective Mayercik came to his house the next day and asked to search it, and the Defendant consented to a search of his home and truck.  The Defendant went with the officer that night to answer questions and give him a statement.

The Defendant explained that, after the victim's death, he was cautious during his

phone conversations with Barger because he consulted with an attorney who told him that his phones were likely tapped. He said the reason he told Barger he wished she had not told police one of her guns was missing was he was concerned the police were gathering evidence to implicate Long and Barger in this crime. The Defendant explained that he asked Barger if she had vacuumed out her car because he knew that the police would have wanted the vacuum bag if they were looking for evidence. The Defendant said he had never had any shells in Barger's car and that the only time he was in her car that weekend was when they went to get a barrel to use to burn trash.

The Defendant said he went to Texas for Christmas because he knew that he could not see Lucas, so he wanted to be with Long and the Defendant's grandmother for Christmas. The Defendant said he received a telephone message from the Department of Children's Services reminding him he had a custody hearing for Lucas at 2:00 p.m. on December 26. He, therefore, returned from Texas earlier than he had planned. He willingly spoke with the detective after his return.

On cross-examination, the Defendant conceded that he described his relationship with the victim as being one based upon sexual attraction. He agreed he "almost" hated the victim at the time of her death. The Defendant said he called the victim multiple times a day because he wanted to see his son, and she was keeping his son from him.

The Defendant acknowledged that Long had testified that the Defendant was unable to carry a gun. The Defendant explained that he had previously been stopped by the police, and he gave them a false name. That led to a conviction, which prohibited him from carrying a gun.

The Defendant described one altercation between himself and the victim that became physical. He said the two were living in Texas with two-year-old Lucas when she hit the Defendant. In response, the Defendant pushed her and said if she ever hit him again she could go back to Tennessee without Lucas or himself.

The Defendant said he never had a key to the victim's house, and, while he lived there, she left the side door unlocked. The only time she locked the door was when she was going out of town for some period of time. He agreed that, while he lived with the victim, there were times when he left the victim's house and then returned after he knew that she had left for work. He explained that he sometimes did not have enough work for the day or sometimes he had to bid on a job.

The Defendant explained that part of the reason he did not want to respond to the interrogatories was because he had not filed tax returns for his work at his cabinet shop. He

was working with a company in Brentwood to prepare the past six years of his tax returns in order to properly respond to the interrogatories.

The Defendant testified he changed clothes after burning Barger's trash because he had gotten something on the clothes he had been wearing. He said he threw the clothes he had taken off into the backseat of his truck and then gathered Lucas and Long to take them back to his house.

The Defendant agreed that he attempted to gather information about what had happened. That included seeking the advice of a Nashville attorney, who told him he should not know more than what the detectives had told him about how the victim had died and that he should not use his phone to discuss anything about the case because it was likely tapped. Further, he sought information about DNA and asked a friend if his DNA could be transferred to the victim or to the victim's house by Lucas, if he had touched Lucas. The Defendant agreed that, at some point after this murder, he attempted to avoid the police because he thought that they had a warrant out for his arrest.

When presented copies of text messages that he sent to another woman on the Saturday this murder occurred, he agreed that the messages included some explicit comments and that he had a "romantic interest" in that woman. The two texted back and forth until approximately midnight, after which the Defendant said he went to sleep.

Based upon this evidence, the jury convicted the Defendant of first degree premeditated murder.

## II. Analysis

On appeal, the Defendant contends that: (1) the evidence is insufficient to support his conviction; (2) the trial court improperly excluded evidence from Karla Teutsch, whom he alleges was a legitimate suspect in this murder investigation; (3) the trial court improperly admitted a statement by the victim as an excited utterance; (4) a question by a juror pursuant to Tennessee Rule of Criminal Procedure 24.1 unconstitutionally violated his right to an impartial jury; and (5) the trial court erred when it failed to provide the jury with a curative instruction about people crying in the courtroom during the trial.

### A. Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to sustain his conviction because there was insufficient evidence that he acted with premeditation when he committed this murder and because Long testified that the Defendant was at Barger's house asleep

during the time of the murder. Also, the Defendant notes that there is no evidence that he was at, or in the vicinity of, the victim's home around the time of the murder. The State counters that there was sufficient evidence presented to support his conviction.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e), *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). A conviction may be based entirely on circumstantial evidence where the facts are "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone." *State v. Smith*, 868 S.W.2d 561, 569 (Tenn. 1993). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 370 S.W.2d 523

(Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn.2000).

In this case, the Defendant was convicted of first degree premeditated murder, a Class A felony. First degree murder is defined as a "premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1) (2001). Premeditation refers to "an act done after the exercise of reflection and judgment." T.C.A. § 39-13-202(d) (2001). Whether the defendant premeditated is for the jury to decide, and the jury may look at the circumstances of the killing to decide that issue. *Bland*, 958 S.W.2d at 660. The Tennessee Code states that, while "the intent to kill must have been formed prior to the act itself," that purpose need not "pre-exist in the mind of the accused for any definite period of time" for a defendant to have premeditated the killing. T.C.A. § 39-13-202(d). The following factors have been accepted as actions that demonstrate the existence of premeditation: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing. *Bland*, 958 S.W.2d at 660. In addition, a jury may consider destruction or secretion of evidence of the murder and "the planning activities by the appellant prior to the killing, the appellant's prior relationship with the victim, and the nature of the killing." *State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000); *State v. Halake*, 102 S.W.3d 661, 668 (Tenn. Crim. App. 2001) (citing *State v. Gentry*, 881 S.W.2d 1, 4-5 (Tenn. Crim. App. 1993)). Also, "[e]stablishment of a motive for the killing is a factor from which the jury may infer premeditation." *State v. Leach*, 148 S.W.3d 42, 54 (Tenn. 2004).

The evidence, considered in the light most favorable to the State, proves that the Defendant, who was at the time involved in a highly contested custody dispute with the victim, took his two sons to the home of his girlfriend, Barger, on December 15, 2007. The Defendant and the victim had been in a dispute about their son Lucas's birthday party, which the victim planned to be held that weekend, which was the Defendant's weekend to have Lucas. After arriving at Barger's house, the Defendant and his two sons went hiking with one of his older son's friends and then returned to Barger's home, where the Defendant cooked dinner and then watched television with Barger and his two sons. Barger went to bed at around 11:00 p.m. At some point thereafter, the Defendant entered Barger's room and asked her to listen for Lucas, which she did. Lucas awoke at 4:30 a.m. and Barger attempted unsuccessfully to phone the Defendant, whose phone was turned off. The Defendant

returned early in the morning and went into Barger's room where she and Lucas were lying in bed watching television. According to Barger, the Defendant got into bed and confessed that he had killed the victim. By all accounts, the day after the murder was a "normal" day during which the Defendant ate pancakes, watched television, and played with his sons. The Defendant burned some trash in a barrel at Barger's request.

The circumstantial evidence against the Defendant included that he was wearing Wrangler jeans on the night of the murder and that pieces of Wrangler denim were found in the burn barrel. The Defendant's contention, apparently rejected by the jury, was that the Wrangler denim in the burn barrel was from a purse that Barger owned rather than from his jeans. Police also learned that the victim was shot by a .32 pistol firing distinctive bullets that were last manufactured before 1977. The type of gun that could have fired these bullets included a Llama. Evidence from the scene also indicated that the gun may have misfired, firing two bullets at one time. Police found in Barger's car two bullets matching the ones found at the crime scene. Barger reported that she was missing a gun from a gun bag that she took from her husband after their divorce. Barger's ex-husband confirmed that the gun bag contained a Llama, that sometimes misfired, and that the bag also contained bullets for the gun that were manufactured before 1977. The police also found muddy footprints inside the victim's home that they believed belonged to the murderer.

In recorded conversations after this murder occurred, Barger mentioned several times that she wished the Defendant had never "told her" and that she did not hate him but that she wanted to know now, statements to which the Defendant never responded. The Defendant expressed his concern that the police were listening to their conversations and about his ability to trust Barger. The Defendant said he was sorry for involving Barger in the situation and said he wished she had not told the police that one of her guns was missing. He also said he would tell the "whole truth" if the police attempted to implicate Barger, and that the he and Barger both knew "the whole truth." At one point, Barger said, "Why didn't you talk to me things could have been so much different" to which the Defendant responded, "I know."

Regarding the Defendant's assertions concerning the lack of physical evidence that he was present in the victim's home when she was murdered, we first note that such evidence is not necessary. The State presented direct evidence against the Defendant, namely Barger's testimony and their recorded conversations, that implicated him as the murderer. The State also presented circumstantial evidence that he murdered the victim: his motive; his access to the gun and the distinctive bullets found in the victim's home; his access to Barger's car where bullets matching those used to kill the victim were found; the burned portion of Wrangler denim in the burn barrel the Defendant used to burn trash; and the mud in Barger's car, given the muddy footprints found in the victim's home. The Defendant offered an alibi

witness, Long, who testified that the Defendant was at Barger's house most of the night, but the jury rejected Long's testimony. Such action by the jury is within its providence. *Bland*, 958 S.W.2d at 659.

The Defendant also argues that the evidence was insufficient to prove premeditation. The first degree murder statute states, "The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation." T.C.A. § 39-13-202(d). The question of whether a defendant has acted with premeditation is a jury question. *State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000); *State v. Holder*, 15 S.W.3d 905, 914 (Tenn. Crim. App. 1999).

In this case, there exist several of the factors accepted as actions that demonstrate the existence of premeditation. First, the Defendant was calm shortly after the killing. *See Bland*, 958 S.W.2d at 660. He returned to Barger's house, lay in bed and told her that he had killed the victim and then went to sleep, only to awake a short time later, eat breakfast, and engage in "normal" daily activities. Second, the victim in this case was unarmed and shot repeatedly in the back of her head. *Id.* Finally, the Defendant clearly had a motive for killing the victim in that the two were involved in a highly contested custody dispute and the Defendant admittedly "hated" the victim, and felt the victim was taking his son away from him. *See Leach*, 148 S.W.3d at 54. Accordingly, we conclude that the evidence is sufficient for the jury to find that the Defendant acted with premeditation and to find him guilty of first degree murder beyond a reasonable doubt. As such, the Defendant is not entitled to relief on this issue.

## B. Alternate Suspect Testimony

The Defendant contends that the trial court violated his Sixth Amendment right to present a complete defense by refusing to allow him to present testimony from and about an alternative suspect, "Kenny," whom the trial court previously declared a material and necessary witness. The State counters that the trial court properly applied the Tennessee Rules of Evidence when it excluded this evidence.

In an offer of proof about "Kenny," Karla Teutsch testified she lived in Shreveport, Louisiana, and she communicated with the victim through a MySpace page she created as a man named "Kenny" from Tennessee. Teutsch said she created a false account using the name "Kenny" and a photograph of a male in an attempt to talk to a girl with whom her boyfriend from Dickson, Tennessee, was having an affair. Teutsch added multiple people, including the victim, as "friends" of "Kenny" on the MySpace page to make the page look more realistic, rather than like a hoax website.

-33-

Teutsch said she did not, in reality, have her hunting license, but as "Kenny" she told the victim that she had been hunting. Also, the weekend that the victim was murdered, Teutsch was in Dickson, Tennessee, hunting with her boyfriend. She explained that she sat in the stand with him but did not have a gun.

After the victim's murder, Detective Mayercik contacted "Kenny" via MySpace and asked him to contact the police. Teutsch googled the detective and learned about the murder. She then emailed the detective and told him that she had created a false website under the name "Kenny" and gave him her phone number.

The trial court excluded this information as not relevant pursuant to Tennessee Rule of Evidence 401 and as misleading pursuant to Tennessee Rule of Evidence 403.

Exclusions of evidence may violate the Due Process Clause of the Fourteenth Amendment of the United States Constitution even if the exclusions comply with rules of evidence. *State v. Flood*, 219 S.W.3d 307, 316-17 (Tenn. 2007). Principles of due process require that a defendant in a criminal trial have the right to present a defense and to offer testimony. *See Chambers v. Mississippi*, 410 U.S. 284 (1973); *State v. Brown*, 29 S.W.3d 427, 431 (Tenn. 2000). In *Washington v. Texas*, 388 U.S. 14 (1967), the United States Supreme Court stated:

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

388 U.S. at 19.

The right to offer testimony, however, is not absolute: "In the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence . . . ." *Chambers*, 410 U.S. at 302. Rules of procedure and evidence are designed to assure fairness and reliability in the criminal trial process. *Id.* So long as the rules of procedure and evidence are not applied arbitrarily or disproportionately to defeat the purposes they are designed to serve, these rules do not violate a defendant's right to present a defense. *Flood*, 219 S.W.3d at 317 (citations omitted). Because "state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials," *Scheffer*, 523 U.S. at 308, "[a]n evidentiary ruling ordinarily does not

rise to the level of a constitutional violation," *State v. Rice*, 184 S.W.3d 646, 673 (Tenn. 2006).

It has long been recognized by the courts of this state that an accused is entitled to present evidence implicating others in the crime. *State v. Powers*, 101 S.W.3d 383, 394 (Tenn. 2003) (citing *Sawyers v. State*, 83 Tenn. (15 Lea) 694, 695 (1885)). The *Powers* court instructed that the Rules of Evidence are adequate to determine whether such evidence is admissible. *Id.* In Tennessee, the determination of whether proffered evidence is relevant in accordance with Tennessee Rule of Evidence 402 is left to the sound discretion of the trial judge, as is the determination of whether the probative value of evidence is substantially outweighed by the possibility of prejudice pursuant to Tennessee Rule of Evidence 403. *State v. Kennedy*, 7 S.W.3d 58, 68 (Tenn. Crim. App. 1999) (citing *State v. Forbes*, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995); *State v. Burlison*, 868 S.W.2d 713, 720-21 (Tenn. Crim. App. 1993)). In making these decisions, the trial court must consider the questions of fact that the jury will have to consider in determining the accused's guilt as well as other evidence that has been introduced during the course of the trial. *State v. Williamson*, 919 S.W.2d 69, 78 (Tenn. Crim. App. 1995). We will only disturb an evidentiary ruling on appeal when it appears that the trial court arbitrarily exercised its discretion. *State v. Baker*, 785 S.W.2d 132, 134 (Tenn. Crim. App. 1989).

Initial questions of admissibility of evidence are governed by Tennessee Rules of Evidence 401 and 403. These rules require that the trial court must first determine whether the proffered evidence is relevant. Pursuant to Rule 401, evidence is deemed relevant if it has "'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *See Forbes*, 918 S.W.2d at 449 (quoting Tenn. R. Evid. 401). In other words, "evidence is relevant if it helps the trier of fact resolve an issue of fact." Neil P. Cohen, et al., Tennessee Law of Evidence § 4.01[4], at 4-8 (4th ed. 2000). After the trial court finds that the proffered evidence is relevant, it then weighs the probative value of that evidence against the risk that the evidence will unfairly prejudice the trial. *State v. James*, 81 S.W.3d 751, 757 (Tenn. 2002). If the court finds that the probative value is substantially outweighed by its prejudicial effect, the evidence may be excluded. Tenn. R. Evid. 403. "'[E]xcluding relevant evidence under [Tenn. R. Evid. 403] is an extraordinary remedy that should be used sparingly and persons seeking to exclude otherwise admissible and relevant evidence have a significant burden of persuasion.'" *James*, 81 S.W.3d at 757-58 (quoting *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 227 (Tenn. Ct. App. 1999) (citations omitted)).

A defendant is entitled to present evidence implicating another in the crime only if the evidence is relevant under Tennessee Rule of Evidence 401 and the evidence is not unfairly prejudicial as provided by Rule 403. *Id.* In a criminal case, evidence that a third party had

the motive and opportunity to commit the offense certainly would be relevant. *Powers*, at 395. Even if the evidence meets the test of relevance, however, Tennessee Rule of Evidence 403 may still justify exclusion of such evidence. Under Rule 403, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." The evidence to establish that someone other than the defendant is the guilty party must be such evidence as would be relevant on the trial of the third party; and the evidence offered by the accused as to the commission of the crime by a third party must be limited to such facts as are inconsistent with the defendant's guilt, and to such facts as raise a reasonable inference or presumption as to the defendant's innocence. *Hensley v. State*, 28 Tenn. 243 (1848). To be admissible, the evidence must be such proof that directly connects the third party with the substance of the crime, and tends to clearly point out someone besides the accused as the guilty person. *State v. Algeron Cross*, No. M2004-01930-CCA-R3CD, 2005 WL 1252631, at *9 (Tenn. Crim. App., at Nashville, May 25, 2005), *perm. app. denied* (Tenn. Dec. 5, 2005). Evidence which can have no other effect than to cast a bare suspicion on another, or to raise a conjectural inference as to the commission of the crime by another, is not admissible. *Id.* (citing 22A C.J.S. Criminal Law § 729 (1989)).

In the case under submission, we conclude that the trial court did not abuse its discretion when it determined that the evidence that Teutsch communicated with the victim via a hoax MySpace page and was in Dickson on the weekend of the victim's murder was not relevant. Teutsch clearly explained the reason she created the MySpace page, and her communications with the victim were benign. The two had never met and never agreed to meet. There was no indication that Teutsch, coincidentally visiting Tennessee the weekend of the murder, had any idea where the victim lived or had ever been to her house. Further, there was no indication that Teutsch had any animosity toward the victim or any motive for harming the victim or any opportunity to do so. The fact that Detective Mayercik had an alternative suspect named "Kenny," who he later determined was not the murderer, was presented to the jury. The trial court did not abuse its discretion when it determined that the further details about "Kenny," presented through Teutsch were not relevant to the victim's murder. The Defendant is not entitled to relief on this issue.

## C. Juror Questions

The Defendant next contends that the trial court erred when it allowed jurors to ask questions pursuant to Tennessee Rule of Criminal Procedure 24.1. He asserts that allowing jurors to ask questions to witnesses should be prohibited in criminal cases because a defendant has a constitutional right to trial by an impartial jury. He asserts that allowing the jurors to ask questions contravenes the legal definition of an "impartial jury" because it

allows the jury to base its verdict on inappropriate inferences or conclusions from information that may not be allowed in the trial as evidence. The Defendant then more specifically complains about the trial court's refusal to ask a particular juror question after already having allowed several juror questions. The Defendant argues that, given the trial court's previous permissiveness about jury questions, its refusal to allow the question implied the question would reveal negative information about the Defendant. He contends this implication led to his being denied his right to an impartial jury.

After the briefs in this case were submitted, in an opinion released in June of this year, *State v. James*, 315 S.W.3d 440, 458-59 (Tenn. 2010), the Tennessee Supreme Court reviewed this issue. It is true that, until recently, the courts of this state had discouraged questions by jurors, describing the procedure as "a perilous practice which trial courts should scrupulously avoid." *Branch v. State*, 469 S.W.2d 533, 534 (Tenn. Crim. App. 1969); *see also Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). In *James*, however, the Court in its opinion, which is squarely on point with the one presently before us, noted that "Rule 24.1(c) of the Tennessee Rules of Criminal Procedure, made effective July 1, 2003, and adopted after several years of study related to the role of jurors, changed that policy."

Tennessee Rule of Criminal Procedure 24.1(c) provides as follows:

In the court's discretion, the court may permit a juror to ask a question of a witness. The following procedures apply:

(1) Written Submission of Questions. - The juror shall put the question in writing and submit it to the judge through a court officer at the end of a witness' testimony. A juror's question shall be anonymous and the juror's name shall not be included in the question.

(2) Procedure After Submission. - The judge shall review all such questions and, outside the hearing of the jury, shall consult the parties about whether the question should be asked. The judge may ask the juror's question in whole or part and may change the wording of the question before asking it. The judge may permit counsel to ask the question in its original or amended form in whole or part.

(3) Jury Instruction. - When juror questions are permitted, the court shall instruct jurors early in the trial about the mechanics of asking a question and to give no meaning to the fact that the judge chose not to ask a question or altered the wording of a question submitted by a juror.

(4) Retaining Questions for Record - All jurors' questions - whether approved or disapproved by the court - shall be retained for the record.

Tenn. R. Crim. P. 24.1(c)(1)-(4).

In *James*, after reviewing this rule and the questions posed to the jury, our Supreme Court held:

> In our view, the procedure implemented by the trial court was not erroneous. Generally, "the propriety, scope, manner and control of the examination of witnesses is a matter within the discretion of the trial judge, subject to appellate review for abuse of discretion." *State v. Caughron*, 855 S.W.2d 526, 540 (Tenn. 1993); *State v. Dishman*, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995). While direct questions of a witness by jurors have occasionally been viewed with disfavor, our courts have also observed that "each case must be judged on its own facts in determining whether error has been committed [by the practice]." *Byrge*, 575 S.W.2d at 295. In the *Branch* and *Byrge* cases, the jurors asked questions of a witness, but apparently without prior approval by the trial court as to either form or substance. Neither of these cases, however, resulted in a new trial on the ground that jurors should never be permitted to question a witness. Further, the 2003 rule, which was motivated by a desire "to assist jurors in their understanding of evidence and to make them feel more involved in the trial process," prescribes a procedure designed to eliminate the pitfalls of unscrutinized direct questioning. *See* Tenn. R.Crim. P. 24.1, advisory comm'n cmt. Prior approval by the trial court of form and substance is essential.

In the case under submission, the Defendant filed a pretrial motion requesting that the trial court not permit juror questions because the practice was unconstitutional. The trial court, after a hearing, denied the Defendant's motion. It is unclear from the record how the trial court charged the jury about its ability to ask questions because that portion of the record, including the voir dire, opening statements, and indictment being read to the jury, was not transcribed.

The record does reflect, however, that the trial court did, at the conclusion of the testimony of most of the witnesses, ask the jury if any of the jurors had any questions. For seven witnesses, the jurors submitted written questions to the trial court. The judge then called both attorneys to the bench for a conference, asked if either attorney objected to the content of the question, and then the judge asked the question of the witness. The Defendant did not object to the content of any of the questions. The State and the Defendant were then

allowed to ask follow-up questions. All of the questions, save one, were clearly not objectionable. In our view, the trial court did not abuse its discretion in the general procedure used for juror questions.

We now address the Defendant's more specific issue concerning a question posed by a juror that the trial court refused to ask, and the trial court's subsequent instruction to the jury. The question about which the Defendant complains occurred after the cross-examination of the Defendant's eldest son, Tanner Long. During the State's cross-examination of Long, the following occurred:

Q. [State's Attorney] Now, you have a gun don't you?
A. [Long] Yes, sir.
Q. And what is it?
A. I have a 12 gauge and a .22.
Q A 12 gauge and a .22. And do you keep those in Tennessee?
A. No, sir. They're in Texas.
Q. Okay. What gun did you have to deer hunt with here in Tennessee?
A. Her deer rifle.
Q. Her deer rifle?
A. Yes, sir.
Q. Did your father have one.
A. No, sir.
Q. Did he have any kind of weapons?
A. No, sir. He's not allowed to.

At the conclusion of Long's testimony, a juror submitted a question asking, "Why can't Mr. Reynolds have a firearm?" The trial court instructed the jury the question was "irrelevant and cannot be considered by you, whoever asked the question, and cannot be considered by the jury in any way." The Defendant, who testified, explained that he had been stopped previously by police and given the police a false identity. The Defendant said this led to a conviction, which prevented him from owning a firearm.

We agree with the Defendant that the trial court's refusal to ask a question posed by a juror is a potential pitfall of Tennessee Rule of Criminal Procedure 24.1(c) in that, in some circumstances, it may lead to a negative inference about the answer to that question. In this case, however, the trial court offered a specific reason why that question could not be asked, that it was not relevant, and instructed the juror and jury not to consider the question in "any way." Thus, we conclude that the trial court did not abuse its discretion in the manner in which it implemented Tennessee Rule of Criminal Procedure 24.1(c). The jury is presumed to follow the trial court's instructions. *State v. Williams*, 977 S.W.2d 101, 106 (Tenn. 1998).

The Defendant is not entitled to relief on this issue.

### D. Excited Utterance

The Defendant next contends that the trial court erred when it admitted testimony about an excited utterance. He asserts that the trial court improperly admitted the victim's statement to Austin, the karate instructor, about an alleged assault at the karate studio. He asserts that, because the State introduced no evidence about the time that passed between the assault and the statement, the State did not lay a proper foundation for the statement's status as an excited utterance. The State counters that the statement qualified as an excited utterance and was, therefore, admissible.

The admissibility of evidence rests within the trial court's sound discretion, and the appellate court does not interfere with the exercise of that discretion unless a clear abuse appears on the face of the record. *State v. Franklin*, 308 S.W.3d 799, 803 (Tenn. 2010). A trial court abuses its discretion only when it applies an incorrect legal standard or makes a ruling that is illogical or unreasonable and causes an injustice to the party complaining. *Id.* (quotations omitted). Generally, out of court statements introduced to prove the truth of the matter asserted are inadmissible as hearsay. Tenn. R. Evid. 801, 802. The excited utterance exception allows hearsay to be admitted when the statement is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Tenn. R. Evid. 803(2).

The Tennessee Supreme Court has interpreted the rule to set forth three requirements for a statement to meet the excited utterance exception. Cf. Neil P. Cohen et al., *Tennessee Law of Evidence* § 8.07[3], at 8-75 to 8-77 (5th ed. 2005). The first requirement is a startling event or condition that suspends the normal, reflective thought processes of the declarant. *Franklin*, 308 S.W.3d at 823 (quotations and citations omitted). Second, the statement must "relate to" the startling event or condition. *Id.* This broad requirement offers "considerable leeway" such that "the statement may describe all or part of the event or condition, or deal with the effect or impact of that event or condition." *Id.* (quoting *State v. Gordon*, 952 S.W.2d 817, 820 (Tenn. 1997)); Cohen et al., § 8.07[3][c], at 8-76. The third and final requirement dictates that the declarant make the statement while "under the stress or excitement from the event or condition." *Id.* This requirement considers a variety of factors, including the interval of time between the startling event and the statement. *Id.* at 823-24. Other factors potentially relevant to deciding whether the declarant made a statement under stress or excitement include "the nature and seriousness of the event or condition; the appearance, behavior, outlook, and circumstances of the declarant, including such characteristics as age and physical or mental condition; and the contents of the statement itself." *Id.* at 823 n.27 (citations omitted).

Underlying the excited utterance exception is the theory that "circumstances may produce a condition of excitement which temporarily stills the capacity of reflection and produces utterances free of conscious fabrication." *State v. Land*, 34 S.W.3d 516, 528 (Tenn. Crim. App. 2000). We have also recognized that a statement made while the memory is fresh in the declarant's mind may be more accurate than a later description of the event in court. *Gordon*, 952 S.W.2d at 819-20 (quoting Neil P. Cohen et al., *Tennessee Law of Evidence* § 803(2).1, at 532 (3d ed. 1995)). We have described the "ultimate test" of whether a statement meets the excited-utterance standard as "spontaneity and logical relation to the main event and where an act or declaration springs out of the transaction while the parties are still laboring under the excitement or strain of the circumstances and at a time so near it as to preclude the idea of deliberation and fabrication." *State v. Smith*, 857 S.W.2d 1, 9 (Tenn. 1993).

In the case under submission, the trial court held a hearing outside the presence of the jury to determine whether these statements by the victim constituted excited utterances. During that hearing and Austin's subsequent testimony, Bobby Austin, the karate instructor, testified that the victim came into the studio crying and upset, and interrupted him teaching a class to tell him that the Defendant had grabbed her and would not leave. Austin went outside and asked the Defendant to leave, and the Defendant refused, so Austin called the police, who responded to this incident. Based upon this evidence, the trial court determined that the victim's statements constituted admissible hearsay because they were excited utterances.

We conclude first that the evidence supports that the victim's statements were made while she was in an excited state. First, by all accounts, the Defendant and the victim engaged in a confrontation outside the karate studio, which necessitated the police being involved. The victim was outside speaking with the Defendant and went inside to seek Austin's assistance. She did not follow protocol, as was her custom, when approaching him, and went directly to him, interrupting him teaching a class. Austin noted that the victim was "crying" and upset, and she said the Defendant grabbed her and would not leave her alone. The victim's statement about her interaction with the Defendant was a spontaneous statement that sprung out of the transaction while she was still laboring under the excitement or strain of the circumstances, i.e., attempting to get the Defendant to leave the karate studio after they had a confrontation. *See Smith*, 857 S.W.2d at 9.

Second, the victim's statement related to the startling event. She was seeking Austin's assistance, and she went into his studio immediately after interacting with the Defendant for the purpose of asking Austin to speak to the Defendant on her behalf.

Third, the victim made her statement while "under the stress or excitement from the

event or condition." *Id.* She was in the middle of her confrontation with the Defendant when she went inside seeking Austin's help. The two of them immediately returned outside to speak with the Defendant, after which the police were called.

We conclude that the statement by the victim met the three requirements for an excited utterance, and, therefore, the trial court did not abuse its discretion when it determined that this statement constituted admissible hearsay. The Defendant is not entitled to relief on this issue.

### E. Curative Instruction About Crying in Courtroom

The Defendant finally contends that the trial court erred when it failed to "cure[]" the effects of members of the audience crying during his trial. The crying, he says, infringed upon his right to an impartial jury. He asserts this Court should adopt a rule:

> requiring trial courts in criminal cases to take the "following steps to cure prejudicial effects when members of a trial audience become emotional and/or outburst, when counsel objects: 1) have a jury-out hearing with both parties' counsel to discuss the appropriate action to minimize prejudice and ensure an impartial jury; 2) give members of the jury a curative instruction instructing them to disregard the distraction and weigh the case only on the testimony and evidence properly submitted during the trial; and 3) poll jurors individually to determine whether any member has been tainted by the emotional disruption.

The State counters that, while the Defendant brought the crying to the trial court's attention, the trial court stated that it had not heard any crying. Thereafter, the Defendant did not request a curative instruction and so, the State says, he has waived this Court's review of this issue, absent a review pursuant to the plain error doctrine.

During the trial, the Defendant's counsel approached the judge and said that audience members were audibly crying and weeping. The trial court said that it had not heard anything. Later, the Defendant's counsel again approached the judge saying that an audience member had "sigh[ed]" loudly. The Defendant's counsel asked the trial judge to address this outside the presence of the jury. The trial judge then asked the audience to "try not to weep out loud or cry out loud or whatever." Defendant's counsel did not request any further instruction be given to the audience or the jury.

Initially, we note that the Defendant failed to move for a mistrial or request a curative instruction. Our rules do not require "relief [to] be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the

harmful effect of an error." Tenn. R. App. P. 36(a).[1]  The Defendant also did not include this issue in his motion for new trial.  *See* Tenn. R. App. P. 3(e).  Thus, he has waived the issue.

Nevertheless, if appropriate, we may review this issue pursuant to the plain error doctrine.  Pursuant to Rule 36(b) of the Tennessee Rules of Appellate Procedure, "an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial" where consideration of the error is "necessary to do substantial justice." Tenn. R. App. P. 36(b).  Before an error may be so recognized, however, it "must be 'plain' and it must affect a 'substantial right' of the accused." *State v. Adkisson*, 899 S.W.2d 626, 639 (Tenn. Crim. App. 1994).  The word "'plain' is synonymous with 'clear' or equivalently 'obvious.'" *United States v. Olano*, 507 U.S. 725, 734 (1993) (citing *United States v. Young*, 470 U.S. 1, 16 n.14 (1985)).  Authority to correct an otherwise "forfeited error" lies strictly "within the sound discretion of the court of appeals, and the court should not exercise that discretion unless the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *Id.* at 732 (citations omitted).

In *State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000), our Supreme Court adopted the definition of "substantial right" promulgated by this court in *Adkisson*.  There, the Court held that "a 'substantial right' is a right of 'fundamental proportions in the indictment process, a right to the proof of every element of the offense, and is constitutional in nature.'" *Adkisson*, 899 S.W .2d at 639.  Our Supreme Court also adopted *Adkisson's* five factor test for determining whether an error should be recognized as plain:

> (a) the record must clearly establish what occurred in the trial court;
> (b) a clear and unequivocal rule of law must have been breached;
> (c) a substantial right of the accused must have been adversely affected;
> (d) the accused did not waive the issue for tactical reasons; and
> (e) consideration of the error is 'necessary to do substantial justice.'

*Id.* (quoting *Adkisson*, 899 S.W.2d at 641-42).  "[A]ll five factors must be established by the record before this court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Id.* at 283.  To be reviewable as "plain," the error

---

[1] Effective July 1, 2009, Rule 52 of the Tennessee Rules of Criminal Procedure was "deleted because harmless error and plain error are covered in amended Tennessee Rule of Appellate Procedure 36(b)." Tenn. R. Crim. P. 52, Advisory Comm'n Cmts.  For this reason, all citations regarding the effect of error in this opinion are to Rule 36 of the Tennessee Rules of Appellate Procedure.  Our analysis of whether an error qualifies as plain remains the same under either rule.

"must [have been] of such a great magnitude that it probably changed the outcome of the trial.'" *Id.* (quoting *Adkisson*, 899 S.W.2d at 642) (alteration in original). Finally, "the burden of establishing entitlement to relief for plain error is on the defendant claiming it." *United States v. Benitez*, 542 U.S. 74, 82 (2004).

In this case, it is unclear whether members of the audience did, in fact, cry, weep, or sigh. The trial court clearly stated that it did not hear any crying, weeping, or sighing, but it nonetheless instructed the audience, outside the presence of the jury, to attempt not to make any such noises. Based upon this record, therefore, we cannot conclude that the record clearly establishes what happened, i.e. whether there was in fact any crying, weeping or sighing by the audience. Further, even were we to conclude otherwise, we cannot conclude that an unequivocal rule of law was broken or that consideration of this issue is necessary to do substantial justice. Therefore, we conclude that this issue is not subject to our review pursuant to the plain error doctrine. The Defendant is not entitled to plain error relief.

### III.  Conclusion

After a thorough review of the record and the applicable authorities, we affirm the trial court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE